Not Intended for Print Publication

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | Case No. 1:04CR00009 |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **TRADON MARQUEZ DRAYTON**, ) | By: James P. Jones |
| ) | Chief United States District Judge |
| Defendant. ) | |

*Anthony P. Giorno, Assistant United States Attorney, Roanoke, Virginia, for United States of America; John E. Jessee and Daniel K. Read, Jessee, Read & Ely, P.C., Abingdon, Virginia, for Defendant.*

The defendant, Tradon Marquez Drayton, is charged by a Third Superseding Indictment with certain drug trafficking offenses, as well as the crime of using a firearm in the course of a drug trafficking crime and causing the death of another, 18 U.S.C.A. §§ 924(c), (j) (West 2000 & Supp. 2005), and a violation of the so-called drive-by shooting statute, 18 U.S.C.A. § 36(b)(1) (West 2000). The defendant has filed a pretrial Motion to Suppress, which has been heard and briefed and is ripe for decision. For the reasons stated below, I will grant the Motion to Suppress.

# I

The government submits that it will offer evidence at trial that Drayton was a crack cocaine dealer in Galax, Virginia, and participated in a shoot-out with rival drug dealers on July 16, 1999. The government asserts that Drayton, standing by the street, fired a .22 pistol at a car containing the rivals. The front seat passenger in the car, an unapprehended co-defendant known only as "Big D," fired a nine-millimeter pistol back at Drayton, but in the excitement Big D shot the car's driver, James Thornton, in the head, killing him. Shortly after the shooting, Drayton was apprehended and charged in state court with shooting into an occupied vehicle. On July 31, 2000, Drayton was acquitted by a jury of the state charge. On July 3, 2004, he was indicted by a grand jury of this court on the federal charges.

Drayton moves the court to suppress the results of a gunshot residue test taken from him by police shortly after the shooting incident. This motion was the subject of an evidentiary hearing, where the relevant historic facts were largely uncontested. Pursuant to Federal Rule of Criminal Procedure 12(d), the following constitutes the court's findings.

## A. Factual Findings.

1. James Cox, an officer with the Galax Police Department, received a report of gunfire at 11:15pm on the night of July 16, 1999, and responded to the

intersection of Country Club Lane and Poplar Knob Lane.  Upon arriving, Cox saw an African-American male wearing a pair of blue pants, a red oversized silky shirt, and a red baseball cap walking from the southwest corner of the intersection toward a white Chevrolet car that was northbound at the stop sign on Country Club Lane.  The male was later identified as the defendant, Tradon Marquez Drayton.  Cox recognized the driver of the car as Christina Peoples.

2. Cox asked Drayton whether he had seen or heard any shooting in that area. Drayton pointed in the direction of the Spivey Apartments and said that he had heard shooting.  Drayton then got into the white Chevrolet, leaving the area northbound on Country Club Lane, and Cox continued on to the Spivey Apartments.

3. While individuals at Spivey Apartments were confirming to Cox that gunshots had been fired, Cox observed a vehicle in the backyard of a nearby house burst into flames.  Upon investigating, Cox found a blue Ford Taurus, its engine still running, crashed partially under the rear porch of the home.  There was an African-American male laying across the front seat, and a substantial amount of blood in the vehicle.  The male was later identified as James Thornton, and the car was identified as belonging to Thornton's mother.

4. Cox and his partner forced open the driver's side door and pulled Thornton a safe distance from the car.  They observed a gunshot wound to the left

side of his head, called for the fire department, and checked for a pulse but found none.

5. After ordering the area roped off, and dispatching messages for the police chief, the investigator on-call and the Commonwealth's attorney, Cox broadcast a "be-on-the-lookout" ("BOLO") message, describing a white Chevrolet Cavalier with a black stripe operated by a white female, and a black male passenger wearing a red silky shirt and red baseball cap who had come from the area of the crash.

6. Patrol officer J.B. Greer received Cox's BOLO and proceeded toward the scene, eventually meeting a vehicle matching the description at the intersection of Country Club Lane and Highway 58. Greer pulled the vehicle over and found it occupied only by Christina Peoples, who admitted having recently given a ride to another person in her car. Peoples voluntarily accompanied Greer to the police department and gave a statement indicating that a black male who met the BOLO description had mistaken her for someone named "Joelle," had requested a ride to his aunt Yvonne Reeves' house, and that Peoples had dropped him off at Oak Street instead.

7. After interviewing Peoples, Greer and his partner went to Yvonne Reeves' residence on Oak Street. While speaking with Reeves on the porch, Greer

noticed a white Chevrolet Cavalier occupied by two individuals, a black female and a black male, drive past on Oak Street. As the vehicle approached, speeding in a residential area, Greer observed the black male in the passenger seat duck down toward the floorboard, which aroused Greer's suspicion. Greer and his partner returned to their patrol car and pursued the vehicle onto Givens Street, catching up to it parked in the middle of the roadway with the passenger door open. Joelle Coltrane, the driver, was the only occupant at that point. Coltrane advised that her passenger had jumped out of the car at Tinky Reeves' residence on Givens Street.

8. Greer then ran on foot to Tinky Reeves' residence and knocked on the door, at which time he was joined by his partner. Javon Reeves answered the door. She was asked if a black male had come running into her house. Reeves said "no," but then made an obvious eye movement indicating that the person was inside the house, and stepped back from the door. Greer entered the house, observed Drayton, who met the description of the BOLO, took him outside, put him down on the ground, and handcuffed him. Drayton did not protest, resist, or struggle, and Greer holstered his weapon.

9. Shortly thereafter, police investigator Lonnie Lineberry arrived at Tinky Reeves' house, and took over the investigation. Neither Greer nor Lineberry recall

- 5 -

Case 1:04-cr-00009-JPJ   Document 337   Filed 03/23/06   Page 5 of 15   Pageid#: 1213

when or if Drayton's handcuffs were removed, though Lineberry made a habit of not handcuffing suspects unless they were causing trouble, which Drayton did not.

10. Cox arrived at Tinky Reeves' house and observed Drayton less than an hour after their initial contact. Drayton was speaking with Investigator Lineberry, at which time Cox identified Drayton as the person for whom the BOLO had been issued. Lineberry spoke with Drayton for five or ten minutes with the intent of determining what Drayton could report about what had occurred at the crime scene. During their discussion, Lineberry neither wore a uniform nor drew a weapon, though he wore a shoulder holster.

11. After the questioning, Lineberry put Drayton in his car and took him to the police station for further questioning. While Lineberry did not expressly threaten Drayton or use overt physical force, he gave Drayton no choice about whether or not to accompany him. Lineberry did not tell Drayton that he was under arrest, but had Drayton refused to go, Lineberry would have formally arrested him. It was Lineberry's practice to interview suspects at the police station whenever possible.

12. Upon arriving at the police station, Lineberry took Drayton to an office and left the door open. Drayton sat in a chair unrestrained, without handcuffs. Lineberry advised Drayton of his *Miranda* rights. Lineberry neither told Drayton that he was free to leave, nor that he was under arrest. Drayton refused to answer any

questions about the shooting. Lineberry then performed a gunshot residue test, consisting of rubbing material across the surface of Drayton's hands, taking only a few seconds. Drayton did not resist but was neither asked for nor gave any consent to the test.

13. At some time following the gunshot residue test, Drayton was charged by the state and remained in police custody.

## B. LEGAL ANALYSIS.

The defendant asserts that the results of a gunshot residue test[1] should be excluded because they were obtained pursuant to an illegal seizure, arrest, and subsequent detention. I first must determine whether the test results were obtained pursuant to a legal detention, either by arrest based on probable cause or by *Terry* stop based on a reasonable suspicion.[2] If I find an illegal detention, then I must

---

[1] A gunshot residue test is used to determine whether an individual has recently handled or fired a gun by identifying either the components of residue deposited on the hands of a suspect or the pattern of metallic particles characteristically left on the hands by the handling of a particular gun. *See* Robert M. Schoenhaus, Annotation, *Admissibility, in Criminal Case, of Results of Residue Detection Test to Determine Whether Accused or Victim Handled or Fired Gun*, 1 A.L.R. 4th 1072 § 2 (1980).

[2] While compulsive administration of a gunshot residue test, like the examination of other physical characteristics, likely does not involve a potential Fourth Amendment issue, see *United States v. Mara*, 410 U.S. 19, 21 (1973) (holding handwriting exemplars not covered under Fourth Amendment), the seizure of the person subject to the test does implicate the Fourth Amendment. *See United States v. Lincoln*, 494 F.2d 833, 839 (9th Cir. 1974). In other words, had Drayton been in lawful custody, the administration of the gunshot residue test would not have required a search warrant or other separate process.

- 7 -

Case 1:04-cr-00009-JPJ   Document 337   Filed 03/23/06   Page 7 of 15   Pageid#: 1215

determine whether an exception to the exclusionary rule applies to allow admission of the test in question. I resolve both disputes in favor of Drayton.

The Supreme Court has considered three distinct types of interactions between citizens and police: (1) arrests, which require police to have probable cause, *see Wong Sun v. United States*, 371 U.S. 471, 479 (1963); (2) brief investigatory stops ("*Terry* stop"), which must be supported by a reasonable, articulable suspicion, *see Terry v. Ohio*, 392 U.S. 1, 21 (1968); and (3) brief encounters between police and citizens, which require objective justification, *see Florida v. Bostick*, 501 U.S. 429, 434-45 (1991). The present case deals with the first and second categories.

The first question hinges on whether Investigator Lineberry had probable cause to arrest Drayton. Probable cause pursuant to an arrest warrant or a warrantless arrest exists where police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a reasonable belief that an offense is or has been committed by the person to be arrested. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause is based on more than "mere suspicion." *Wong Sun*, 371 U.S. at 479. Under *Ornelas v. United States*, 517 U.S. 690 (1996), I look to a two-fold determination to determine whether probable cause existed. First, I must review the historical facts incident to the stop.

*Id.* at 695. Next, I must determine whether the historical facts, when viewed from the perspective of a reasonable police officer, amount to probable cause. *Id.* at 696-97.

After carefully reviewing the historical facts from the perspective of a reasonable police officer, I find that probable cause did not exist to arrest Drayton. Drayton was observed near the scene of the shooting shortly after the shooting and admitted having heard gunfire in the vicinity of Spivey Apartments. It was based on that information alone that Cox broadcast the BOLO message. Shortly thereafter, Greer learned that a person closely matching the BOLO broadcast had been given a ride to Givens Street, where Green observed a similar individual duck down toward the floorboard of the white Chevrolet Cavalier and where the same individual jumped from a moving vehicle at Tinky Reeves' residence. Those facts, taken together, do not produce trustworthy evidence worthy of a reasonable belief that Drayton had committed a criminal offense. While Drayton was observed near the scene of the shooting, no other evidence linked him to the actual events that had taken place. No reasonable police officer would have determined that probable cause existed under those facts.

Because I find that the police did not have probable cause to arrest Drayton, my inquiry shifts to whether the officers' conduct amounted to a *Terry* stop, justifiable by a reasonable, articulable suspicion. I find that Investigator Lineberry's conduct

- 9 -

in this case exceeded the permissible bounds of a *Terry* stop, and that Drayton's detention amounted to an illegal arrest.

In *Terry v. Ohio*, 392 U.S. 1, 26 (1968), the Supreme Court created a narrow exception to the probable cause requirement of the Fourth Amendment. It held that a police officer may stop an individual reasonably suspected of criminal activity, question him briefly, and perform a limited search for weapons. *Terry*, 392 U.S. at 22-24. Such an investigatory detention may be initiated by police only if they have reasonable, articulable suspicion of criminal activity. *Id*. at 21-22. To meet the standard, a suspicion must be based on specific and articulable facts as well as rational inferences drawn from those facts, which in total reasonably suggest recent or imminent criminal behavior. *Id*. at 21.

Rather than creating a bright-line rule for use in determining when a *Terry* stop becomes an arrest, the Supreme Court has mandated a case-by-case analysis, accompanied by factors upon which courts should focus. These include police diligence in resolving the reasonable suspicion, scope and nature of restraints placed on an individual's liberty, and whether the detainee was transported to an alternate location, particularly a police station. *See United States v. Sharp*, 470 U.S. 675, 687-88 (1985); *Dunaway v. United States*, 442 U.S. 200, 216 (1979); *Park v. Shiflett*, 250 F.3d 843, 851-52 (4th Cir. 2001).

In *Dunaway v. United States*, a police detective ordered other detectives to "pick up" the defendant and "bring him in" to the station, despite lacking sufficient evidence to secure an arrest warrant. 442 U.S. at 203. Three detectives went to the defendant's house, took him into custody, drove him to police headquarters in a police car, placed him in an interrogation room, and gave him appropriate *Miranda* warnings. *Id*. The defendant ultimately gave incriminating statements, which he moved to suppress. *Id*. at 203.

The Court, in reversing the state court's decision to deny the motion, held that the police's treatment of the defendant was "indistinguishable from a traditional arrest." *Id*. at 212. Rather than being questioned where he was found, he was moved to the police department into a traditional interrogation situation, and was not told he was free to leave. *Id*. at 212. The Court opined that extending *Terry*'s exception to the *Dunaway* facts would result in a severely diminished Fourth Amendment general rule. *Id*. at 213.

Here, I find that there are sufficient facts to support a reasonable suspicion that Drayton was or had been involved in criminal activity. Drayton had been observed near the scene of the crime shortly after the shooting occurred, and admitted hearing shooting. That fact, combined with his obvious efforts to evade the police by ducking into the car's floorboard, jumping from a moving vehicle, and taking shelter in a

family member's home, combine to support a reasonable suspicion of criminal activity.

The circumstances surrounding Drayton's detention are similar to those in *Dunaway*. As I found above, the police had reasonable suspicion sufficient to stop and frisk Drayton at the Reeves residence. However, upon finding no weapons and learning no additional facts regarding the shooting or incriminating Drayton thereof, the officers' authority to detain Drayton under *Terry* terminated. Instead, Investigator Lineberry required Drayton to accompany him to the police station. It was while he was under interrogation at the police station that Drayton was administered the gunshot residue test at issue here.

These facts, particularly when viewed in light of *Dunaway*, are clearly more aligned with procedures incident to a traditional arrest, than with a brief investigatory detention related only to a reasonable suspicion of criminal activity. Accordingly, I find that Drayton's detention in the early morning hours of July 17, 1999, amounted to an illegal arrest, and that the gunshot residue test was obtained incident to that illegal arrest.

As a general rule, evidence obtained as a result of a Fourth Amendment violation is inadmissible. *Weeks v. United States*, 232 U.S. 383, 393 (1914). The burden is on the government to prove admissibility. *Brown v. Illinois*, 422 U.S. 590,

604 (1973). The Supreme Court has recognized an exception to the exclusionary rule, however, which it first articulated in *Wong Sun v. United States*, 371 U.S. 471 (1963).

In that case, the Supreme Court considered whether statements and other evidence obtained after an illegal arrest or search should be subject to the exclusionary rule. *Id*. at 487-88. There, federal agents obtained an oral statement from a defendant, Toy, after having forced entry into his laundry, which also served as his living quarters, and placed the defendant under arrest. *Id*. at 474. The Court upheld the Court of Appeals's finding of no probable cause for his arrest. *Id*. at 413.

Using information from Toy's statement, the agents questioned Yee, who implicated Wong Sun. *Id*. at 475. After gaining admittance to Wong Sun's residence, an agent handcuffed Wong Sun and took him to the station. *Id*. at 475. After his arraignment, Wong Sun was released on his own recognizance; several days later, he returned voluntarily and gave an unsigned confession. *Id*. at 475-76, 491. The Court held that, despite the fact that Yee's statements were subject to the exclusionary rule, Wong Sun's confession was admissible when viewed in light of his arraignment, release, and voluntary return. *Id*. at 491. The Court held that attenuation between the confession and the illegal arrest cured the taint of the illegal seizure. *Id*.

In *Brown v. Illinois*, the Supreme Court set out more particular factors that a court should consider when determining whether a voluntary act was sufficiently

- 13 -

Case 1:04-cr-00009-JPJ   Document 337   Filed 03/23/06   Page 13 of 15   Pageid#: 1221

attenuated from the illegal search or seizure to render evidence admissible: (1) temporal proximity of the arrest and the subsequent seizure of evidence; (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603-04. None of these factors weigh in favor of the government's position here.

As to temporal proximity, the gunshot residue test was performed nearly contemporaneously with the illegal arrest. Lineberry took Drayton to the police station, reviewed a *Miranda* form[3], and administered the gunshot residue test. Cases finding attenuation under *Brown* have required much longer time periods. *See Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (six hours between illegal arrest and confession, rendering it inadmissible); *United States v. McCraw*, 920 F.2d 224, 230 (4th Cir. 1990) (consent to search home contemporaneous with illegal arrest, so evidence inadmissible).

Next, there were no intervening circumstances between the illegal arrest and the seizure. The gunshot residue test was administered almost immediately following Drayton's arrival at the police station. As noted previously, advisement of *Miranda*

---

[3] As has been held numerous times by the Supreme Court, *Miranda* warnings do not warn criminal defendants of their rights under the Fourth Amendment, "do not alone sufficiently deter a Fourth Amendment violation," and are thus not relevant to a Fourth Amendment inquiry. *Brown v. Illinois*, 422 U.S. at 601.

warnings does not affect Fourth Amendment rights and is not relevant to the present analysis. Last, the purpose behind Drayton's detention was investigatory in nature, carried out with the hope that additional evidence might turn up. Such a purpose is impermissible. *See Brown*, 422 U.S. at 605. Further, while Lineberry did not threaten or use physical force with Drayton, it is clear from the facts that Drayton had no choice but to accompany Lineberry to the police station for the express purpose of answering questions.

When viewed as a whole, the circumstances occurring between the illegal arrest and the administration of the gunshot residue test do not meet the standard articulated in *Brown* for attenuation of the taint. Accordingly, I find that the results of the gunshot residue test were attained pursuant to an illegal seizure in violation of the Fourth Amendment and must be excluded.

II

For the foregoing reasons, it is **ORDERED** that the Motion to Suppress is GRANTED and evidence as to the gunshot residue test is excluded.

ENTER: March 23, 2006

/s/ JAMES P. JONES
Chief United States District Judge

- 15 -

Case 1:04-cr-00009-JPJ   Document 337   Filed 03/23/06   Page 15 of 15   Pageid#: 1223